IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| TBL LICENSING, LLC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| ) | Civil Case No. 1:21CV681 |
| V. ) | |
| ) | |
| KATHERINE K. VIDAL, ) | |
| Under Secretary of Commerce ) | |
| for Intellectual Property and ) | |
| Director of the United States ) | |
| Patent and Trademark Office, ) | |
| ) | |
| Defendant. ) | |
| ) | |

## MEMORANDUM OPINION

This matter comes before the Court on Plaintiff TBL

Licensing, LLC's ("TBL" or "Timberland") and Defendant Katherine

K. Vidal's, in her official capacity as Under Secretary of

Commerce for Intellectual Property and Director of the United

States Patent and Trademark Office ("USPTO"), Cross Motions for

Summary Judgment.

TBL filed U.S. Trademark Application Serial No. 86/634,819

seeking registration of eight specified features of one of its

boots as a trademark.  A USPTO Trademark Examining Attorney

finally refused registration on two grounds: (1) that the

alleged trade dress is functional and therefore ineligible for

1

registration under Lanham Act § 2(e)(5), 15 U.S.C. § 1052(e)(5); and (2) that TBL failed to prove acquired distinctiveness under Lanham Act § 2(f), 15 U.S.C. § 1052(f), because consumers primarily recognize the eight specified features as features of the boot, not as source indicators. TBL appealed to the USPTO's Trademark Trial and Appeal Board ("TTAB" or "Board"). After full briefing and oral argument, the Board affirmed the refusal to register on the ground that TBL failed to prove acquired distinctiveness. Because that affirmance alone disqualified the alleged trade dress from registration, the Board opted not to reach the issue of functionality.

TBL filed this civil action under Lanham Act § 21(b), 15 U.S.C. § 1071(b), claiming that its alleged trade dress satisfies the two requirements for registrability: that it is not functional and has acquired distinctiveness. Although the parties label their submissions motions for summary judgment, they have agreed that if this Court determines that there are disputed issues of fact, it may resolve them based on the record. Thus, this case is, in substance, being submitted for trial on a stipulated record. See, e.g., Satellite Tel. & Assoc. Res., Inc. v. Cont'l Cablevision of Va., Inc., 714 F.2d 351, 354 (4th Cir. 1983).

During proceedings before the USPTO and discovery in this Court, a body of evidence about the potential registrability of the TBL boot design has emerged. The body of evidence comprises utility patents, advertising and promotional materials including media items, and testimony of experts. The evidence below pertains to the eight elements of the applied-for boot design: collar, two-tone sole, lug soles, hourglass heel counter, quad stitching, shape of the vamp stitching, hexagonal eyelets, and bulbous toe box.

The first element of the applied-for design is a collar. Timberland advertising and third-party media clips tout the functional benefits of the padded collar. One Timberland advertisement features Timberland boots that can be found with the extra comforts of padded leather collars and glove leather linings.  Articles such as one from the men's fashion website Hypebeast also note this benefit. The padded collar for a comfortable fit around the ankle helps keep out debris from any circumstance.

Utility patents, including one of TBL's, disclose soft, padded collars like that of the applied for boot design for comfort and protection from outdoor elements.

Timberland's U.S. Patent No. 7,730,640 ("Timberland's '640 patent"), issued in 2010, depicts a collar indistinguishable from the collar at issue here. It discloses a "high-performance

boot" including an upper that primarily comprises a collar 420, which provides comfort around the ankle region of the wearer.

U.S. Patent No. 3,545,107, issued in 1970, discloses a cushioned upper back portion for reducing and substantially eliminating chafing and binding. The upper back portion provides a relatively soft, padded, yieldable collar.

And U.S. Patent No. 3,803,731, issued in 1974, discloses a shoe with a collar constructed of a cushioning element and secured to the top edge of the upper opening.  The collar is made of a tubular, soft leather or synthetic leather-like material.  The tube is filled with foam material. The collar provides comfortable, light, and firm support without scraping the wearer's leg.

The exemplar TBL boot collar was dissected to reveal a tube made of a soft natural or synthetic leather filled with a foam material as claimed in the'731 patent. The exemplar collar acts as a gasket around a wearer's leg, excluding debris, snow, and water from the boot while containing warm air in the boot.

The second element is a two-tone sole. The two-tone sole adopts a long-known configuration, which is really a multi-hardness two component sole, not a one-piece sole decorated with different colors. TBL and third parties have touted three advantages of this type of sole construction: it combats fatigue, it is easy to replace, and it is waterproof.

4

The sole combats fatigue because it is made of multiple components: a hard rubber outsole, a relatively softer rubber midsole, and, inside the heel, a section of spongy material.

In its advertising, TBL has touted that its exclusive anti-fatigue technology is built into the midsole. And TBL has advertised a light-weight, dual-density sole comprising a midsole bonded to a durable rubber outsole.

The exemplar boot was cut down the midline to dissect the sole. The outsole and midsole are composed of rubber. The recess in the heel is filled with a sponge rubber or other soft, springy material. Using an industry standard instrument, the exemplar boot's outsole is about 10-15 degrees harder than the midsole, just as TBL promotes.

Utility patents disclose that more than one grade of hardness for sole construction improves comfort. U.S. Patent No. 1,559,532, issued in 1925, discloses a resilient sole for boots and shoes. In one version of the sole, the intermediate sole is preferably made of rubber, rubber fabric, or other suitable waterproof material. There is a recess in which material such as sponge rubber or other soft springy material can be inserted. This patent teaches a light weight, cushioned and less expensive method of producing a sole.

U.S. Patent No. 3,793,750, issued in 1974, discloses an athletic shoe. The shoe includes an upper portion that is bonded to a two-component sole comprising an intermediate sole made of resilient material such as synthetic rubber whose lower surface is bonded to an outer sole layer made of a harder rubber or other synthetic material.

The sole of the applied-for boot design permits replacement of a worn outsole. The fashion website and store Allsole reports that, as the upper and sole are two separate pieces, the sole is easily removed and replaced. While Timberland does not currently offer this service, any good cobblers or shoe repair store should be able to replace well-worn soles.

The sole of the applied-for boot design helps waterproof the boot because it is directly bonded to the rest of the boot without stitching. Timberland's '640 patent teaches that the midsole may connect the upper with the outsole of the boot in a water-tight fashion in order to provide the wearer with protection from water, even when the wearer stands in a certain depth of water. Timberland advertisements tout that the lug outsoles are permanently bonded to the top of the boot to guarantee that feet will stay dry.

The third element of the Timberland boot at issue is the lug sole, which improves traction. Swiss Patent No. 214,887 ("Bramani"), issued in 1941, discloses a boot with a rubber sole

6

that has rubber bosses, or lugs, on the outside. The named inventor, Vitale Bramani, is the namesake of the brand Vibram, which makes soles for many shoes on the market today, including Timberlands. In his patent, Mr. Bramani explains that the rubber bosses provide superior grip on all terrains, especially on rock, compared to that of prior soles, which were often outfitted with iron nails. The sole is glued to the boot to make it perfectly waterproof.

Timberland's classic yellow boot has Vibram Carrarmato soles, which Vibram touts as having maximum support and durability. Timberland's '640 patent depicts the very Vibram-style lug sole in the applied-for design, teaching that the lugs are useful for traction.  Timberland advertisements and promotional materials not only characterize the boot as being suitable for hiking and similar outdoor uses, but they also frequently tout the traction afforded by the lug soles claimed in the trademark application.

The fourth element, an hourglass heel counter, is a stitched heel counter with an outer boundary that looks like an hourglass. This is important to help keep the vamp and the upper from wearing and degrading from constantly pulling boots on and off and to avoid having to stitch together the two edges of the upper or vamp along the rear, where it could uncomfortably crinkle and wear over time. Also called a backstay and heel

guard, this component is a strip of leather that runs up the back of a shoe or boot, and is "used for additional stability and sometimes to connect the two halves of the quarter.

TBL promoted its boot by advertising to customers that they should be the one who never comes apart at the seams.

U.S. Patent No. 1,620,712 ("L.L. Bean"), issued in 1927, discloses an inner and outer back stay for leather-top rubbers. The inner stay is a substantially triangular shaped rear insert. The backstay remedies a problem with seam bursting. When a wearer pulls on the shoes over the heel, the wearer can catch the heel on the shoe, which can tear the stitching that holds the vamp and upper together. L.L. Bean's backstay remedies the problem by extending across the edge at the joint between the vamp and upper. The L.L. Bean patent also claims an outer back stay in a configuration that runs narrow along the upper part of the back stay and is wider as it approaches the heel portion. This outer back stay effectively protects the stitching where the two ends of the upper meet in the back of the shoe or could also cover the space between the edges of the upper.

The fifth element of the applied-for boot design is quad stitching. It has long been known that additional rows of stitching improve durability.

U.S. Patent No. 1,360,177, issued in 1920, discloses a boot stitched with the same configuration as the TBL boot design. The

8

Patent explains this method of stitching the vamp to the upper, not only prevents the front part of the attachment point from coming into contact with obstacles during use so that the corner stitching wears and rips, but also prevents leakage. The drawing shows three rows of stitching, but another patent, U.S. Patent No. 799,685, issued in 1905, confirms that four rows are even better when it comes to boots.  There are preferably about four rows of stitches, all or all but one of which by preference pass through all the layers.  This affords great security and durability and effectually prevents leakage at the top of the foot portion.

U.S. Patent No. 1,725,749, issued in 1929, describes and claims a waterproof seam for a boot. This patent depicts four rows of stitching to secure the vamp to the upper. It recommends using a sealant such as glue in the lap space between the leathers to reinforce the quad stitching.

Timberland's U.S. Patent Application Publication No. 021/0145124 teaches a boot with one or more rows of stitches … that run continuously.  Although the example boot in this application has three rows of stitching, the application states that embodiments may include more than or less than three rows of stitching. An advantage of a continuous stitching and multiple rows of stitching is that the movement of the seam during wear may be limited.

TBL's advertisements themselves tout not only the boot's waterproof qualities but in particular that its four rows of stitching resist the effects of rot, mildew, and stress over wear time.

The sixth element, the U-shaped end of the vamp stitching on the boot, is described in U.S. Patent No. 1,360,177. This Patent teaches that the U-shaped end of the vamp/upper stitching configuration in the applied-for design keeps the boot together over time when worn in outdoor settings. For instance, where the wearer is walking through brush that otherwise could fray and damage the seam attaching the upper to the vamp.  This patent describes and claims this now-commonplace benefit, a feature for joining the upper and vamp with a notch and a stitch line that curls under the upper in what TBL calls a U-shape.

The seventh element, a hexagonal eyelet, is a common piece of hardware that can be found on many items of footwear. The crimped circular flange for the ski boot is essentially the same eyelet on the exemplar Timberland boot. The hexagonal eyelets result from crimping the sides of the eyelets to securely affix them to the leather. These points formed by making the flange in the shape of a hexagon serve as braces, extending radially from all sides of the flange.

Crimping the sides of an eyelet to create a hexagonal shape is not a new technique. U.S. Patent No. 138,221, issued in 1873, discloses and claims precisely that eyelet. The functional benefits disclosed are that hexagonal eyelets stay secured to the shoe better and can be stamped with less wasted metal than round eyelets. The patent explains that the advantages accruing from the hexagonal-flanged eyelet will be appreciable more in connection with the shoe trade than elsewhere.

The eighth and final element of TBL's applied-for boot design, is a bulbous toe box. Boots worn in work environments need to have a safety toe built in to prevent feet from being crushed. Occupational Safety and Health Administration ("OSHA") regulations require safety toes in many work environments. Safety toes are typically built into the toe box.  Safety toe inserts require a bulbous toe construction. And rounded bulbous toes also are considered to be healthy because the toes can move inside the boot, thereby increasing circulation to the foot.

U.S. Patent No. 8,359,772, issued in 2013, which discloses construction boots, explains that a toe cap protects the toes against the impact from objects falling against the footwear. TBL argued before the agency that its boot does not have an approved safety toe or any structural reinforcement of the toe cap.  TBL's boot includes a hard-plastic toe reinforcing element within the bulbous toe that results not only in structural and

11

foot-health benefits, but whose shape is similar if not identical to that of boots with officially-approved safety toes. TBL admits that it uses a plastic insert. Moreover, the shape of the bulbous toe corresponds to the shape of both competitors' and TBL's own safety toe boots. Even without any plastic or steel insert, the additional room afforded by a bulbous toe box like TBL's adds incremental safety just like a crumple zone adds safety to a car.

TBL has consistently stated that boots embodying its applied-for design are not only suitable as a work boot, but also originally designed as one.

Under Lanham Act § 2(e)(5), trade dress cannot be registered if it is functional as a whole. 15 U.S.C. § 1052(e)(5). Section 2(e)(5) legislatively adopts longstanding judicial precedent and USPTO practice barring the registration of functional matter. That precedent and practice strike a balance between trademark law and patent law: the former protects reputation, potentially in perpetuity, because registered trademarks do not expire as long as they continue to designate the source; the latter promotes innovation with a patent grant for a limited term of 20 years from the date of issuance. Qualitex Co. Jacobson Prods. Co., 514 U.S. 159, 164-65 (1995). When a patent expires, the claimed invention enters the public domain, advancing innovation. TrafFix, 532 U.S. at 34-35.

Thus, even if functional trade dress has acquired distinctiveness, the Lanham Act bars registration because the matter should be protected, if at all, by patent law rather than trademark law. See id.; Lanham Act § 2(f), 15 U.S.C. § 1052(f).

The Fourth Circuit weighs four factors to assess functionality: (1) the existence of utility patents disclosing the applied-for design, (2) advertisements and other promotional materials touting the functional benefit of the design, (3) the existence of alternative designs, and (4) any effect on the manufacturing or quality of the product. CTB, 954 F.3d at 657-58. A strong showing on the first two factors, utility patents and advertisements, compels a finding of functionality, because a prior patent has vital significance in resolving the trade dress claim, constituting strong evidence that the features therein claimed are functional. A finding that a proposed mark is functional is a question of fact. CTB, Inc. v. Hog Slat, Inc., 954 F.3d 647, 658 (4th Cir. 2020); In re Becton, Dickinson and Co., 675 F.3d 1368, 1372 (Fed. Cir. 2012).

The evidentiary record before the agency, and additional evidence in this Court, presents a case that TBL's applied-for design is functional. Utility patents disclose, and some claim, the features of TBL's applied-for design, and TBL's own advertising touts the functional benefits the features.

Evidence as to the first two factors proves this case does not involve any ornamental, incidental, or arbitrary aspect of boots. Each of the claimed features is common in the industry and has been for decades.

At least one utility patent discloses each feature of the boot design, and some patents claim the features.

Most of the issued patents cited in this brief have expired, meaning that the disclosed features are in the public domain. To conclude that TBL can strip the public's right to copy and benefit from these features today would be antithetical to the pro-competitive objectives of both trademark and patent law.

The record is replete with materials published by Timberland and third parties extolling the functional benefits of each element of the applied-for design. This includes TBL's usage of the claimed features for their precise intended functional purposes: the seams as seams, the two-piece sole as a two-piece sole, the bulbous toe as a roomy toe, the eyelets as eyelets, the ankle collar as an ankle collar, and so on. The features of the applied-for boot design as a whole do what these features are supposed to do in any good boot: they make it comfortable, they make it durable, they make it waterproof, and they make it suitable for its intended uses, including hiking

14

through a variety of environments and pursuing some work projects for which toe protection is needed.

Now turning to the secondary meaning (also known as acquired distinctiveness), which requires proof that, in the minds of the public, the *primary* significance of a product feature or term is to identify the source of the product rather than the product itself. Inwood Labs., Inc. v. Ives Labs., Inc., 456 U.S. 844, 851 n.11 (1982). The Fourth Circuit has made clear that secondary meaning entails a rigorous evidentiary standard. George & Co. v. Imagination Entm'nt Ltd., 575 F.3d 383, 395 (4th Cir. 2009) (citation omitted); U.S. Search, LLC v. U.S. Search.com Inc., 300 F.3d 517, 525 (4th Cir. 2002) (same). Such a standard is hard to meet in product design cases because normally it is difficult to parse apart how much of sales success is due to the inherent desirability of the product. That in turn makes it hard to determine how much, if any, of the product's success is due to consumers seeing the design as a source-identifier.

Consumers do not associate the design of a product with a particular manufacturer as readily as they do a trademark or product packaging trade dress. In the context of product design marks, it is imperative that the evidence of acquired distinctiveness relate to the promotion and recognition of the specific configuration embodied in the applied-for mark and not

15

to the goods in general. Secondary meaning cannot be proven by advertisements that merely picture the claimed trade dress and do nothing to emphasize or call attention to it.

Six factors are considered in assessing acquired distinctiveness: (1) advertising expenditures; (2) consumer studies linking the mark to a source; (3) record of sales success; (4) unsolicited media coverage; (5) attempts to plagiarize the mark; and (6) the length and exclusivity of the plaintiff's use of the mark. George & Co., 575 F.3d at 395 (citing Perini Corp. v. Perini Constr., Inc., 915 F.2d 121, 125 (4th Cir. 1990)).

For product features to be protected as a trademark, the evidence must show that people primarily view them not as product features but as indicators of source. Wal-Mart Stores, Inc. v. Samara Bros., Inc., 529 U.S. 205, 211 (2000). To determine this, courts look at many different kinds of evidence, including advertising and consumer surveys. See, e.g., George & Co. v. Imagination Entm'nt Ltd., 575 F.3d 383, 395 (4th Cir. 2009). The issue of acquired distinctiveness is also a question of fact. Becton, Dickinson, 675 F.3d at 1372-73; U.S. Search, LLC v. U.S. Search.com Inc., 300 F.3d 517, 525 (4th Cir. 2002).

TBL uses the registered TIMBERLAND word mark, the registered Timberland tree logo, both of which appear on the

boot itself and their boxes, and multiple registered slogans as the means to identify source.

Where multiple competitors use the design that one company wants for its own, consumers will not see the design as indicating a unique source of goods.

Teaching customers to "look for" whatever design feature said to be a source identifier is a critical form of advertising in product design trademark cases.

Despite almost 50 years of advertising, TBL has not produced any evidence that it has engaged in "look for" advertising.

When TBL's advertisements do mention any of the applied-for features, they mention the functional benefits, such as waterproofing and durability.

TBL identifies itself as the source of its boots through use of a comprehensive range of traditional word marks, stylized word marks, logos, and slogans. These marks allow consumers to see that a boot is a TBL product before they get close enough to examine a pair of boots to tick off a check-list of eight specific product features.

In addition to these registered word and logo trademarks, TBL has for years called consumers' attention to the yellow color of its best-selling boot.  It applied to register the

color yellow itself for boots, but the USPTO refused to award
TBL exclusive rights in the color because many competing
bootmakers produced similarly colored boots.

As the examples of advertising materials TBL has provided
bears out, the source-identifying significance of TBL's
comprehensive use of traditional trademarks cannot be
overstated. Indeed, the media, and TBL itself, have noted that
consumer identification of the boot with TBL took off when TBL
decided, in the 1970s, to take the then-unusual step of burning
its tree logo into the outward-facing side of the boot. What
really made this boot an icon was the decision to burn its
Timberland tree logo into the side of the leather upper. In
another publication for its retailers about the brand's history,
TBL pointed to the registered tree logo, stating the Timberland
logo stands for quality, durability, and performance. Some
retailers/commercial partners actually tout the TBL Tree Logo on
the side of the boot (and sometimes the tongue) as a "feature"
of the product, as does even TBL itself. The various store
displays that TBL offers to its retailers and the actual
Timberland product displays in retail stores feature large-scale
depictions of the registered TIMBERLAND word mark and registered
tree logo to identify the products as TBL's and draw customers
to the displayed products long before they get close enough to

18

carefully examine whether the boots contain all eight claimed features.

The saturation of the market with look-alike boots using many of the same functional features is fatal to TBL's claim that consumers look for these features to identify TBL's boots and distinguish them from competing boots. TBL itself acknowledges over and over in its advertisements that there are many imitators. This is at odds with the principle of secondary meaning, which requires that a mark or dress has come through use to be uniquely associated with a specific source. Two Pesos, 505 U.S. at 766 n.4; see also Coca-Cola Co. v. Koke Co. of Am., 254 U.S. 143, 145-46 (1920) (secondary meaning means the mark has acquired a secondary significance and . . . indicate[s] the plaintiff's product alone …. It means a single thing coming from a single source, and well known to the community.) (emphasis added); George & Co., 575 F.3d at 394 (a mental association in buyers' minds between the alleged mark and a single source of the product). If the alleged mark is used by more than just the claimant, acquired distinctiveness may be impossible to prove. Third-party use undermines the claim that the relevant public perceives this designation as identifying only one source in the marketplace.

TBL argues that its sales and advertising of boots with the claimed features are so large that trademark rights must attach.

While the numbers are impressive, trying to prove that consumers see a product design as a brand is a different matter. In particular, in assessing sales numbers in product design cases, the inference normally drawn from a product's market success is that the sales reflect the desirability of the product configuration rather than the source-designating capacity of its features. See Duraco Prods., Inc. v. Joy Plastic Enters., Ltd., 40 F.3d 1431, 1453 (3d Cir. 1994); see also In re Bongrain Int'l (Am.) Corp., 894 F.2d 1316, 1318 (Fed. Cir. 1990). Here, the product seller's advertising, to the extent it mentions the features for which trade dress protection is sought, highlights the functional benefits of the features.

The same problem is present in attempts to use large advertising expenditures as evidence.  The Plaintiff spent an arguably large sum of money on advertising but this is of limited probative value. Plaintiff did not present evidence establishing that the advertising effectively created secondary meaning as to the product.

TBL has failed to link-up its large sales and advertising numbers with the one thing it needs to prove: that amidst a sea of similar-looking boots, consumers nevertheless can identify TBL's product just by the eight specified product features irrespective of any other marks used on or with the product.

The advertising evidence that TBL offers in this case is notable for the lack of "look for" advertising. Over decades of intense promotional activity, TBL has advertised its products using many different themes, but never did it advertise that consumers should look for any of the things it now claims constitute protectable trade dress as source-identifiers, such as eyelets, lug soles, the collar, and so on, let alone all the elements together.

Unsolicited media coverage can be evidence of acquired distinctiveness, see George & Co., 575 F.3d at 395, and TBL submits celebrity photos and social media posts here. But TBL itself has admitted that these photos don't show recognition of the features claimed here.

In 2014, TBL filed an application to register the color yellow for boots, arguing that consumers identified TBL's boots, and distinguished them from everyone else's, by their yellow color. The sworn statements of TBL executives and evidence in that case undercut the sworn statements and evidence TBL submits in this case. TBL offered in the application for the yellow color many of the same paparazzi articles with celebrity photos it submitted in this application.

During TBL's prosecution of the now-abandoned yellow color application, two of its officers swore under oath that the only way those paparazzi articles were able to identify the

21

celebrities' boots in those photos as Timberland boots was by the yellow color because nothing else identifying the boots as TBL's was discernable from the photos.

One of the factors potentially relevant is evidence of efforts to plagiarize the mark. George & Co., 575 F.3d at 395; accord Converse, Inc., 909 F.3d at 1120.  TBL argues that any similar boots on the market should be considered infringers. TBL identifies no court findings that anyone has been found to have copied these features in violation of the Lanham Act. TBL does aver that it successfully persuaded two of its many competitors to change their allegedly similar-looking boots. But in response to a USPTO document request for documentation of this alleged enforcement activity, TBL produced no communications with either company.

It is incumbent on the party trying to prove acquired distinctiveness through policing to disentangle competitors' desire to offer products with desirable functional features from any alleged intent to trade on nonfunctional goodwill. See, e.g., Duraco Prods., 40 F.3d at 1453.

TBL also offers a survey and marketing report. The report suffers from deficiencies that fail to prove secondary meaning.

First, the Barone Survey (the "Survey") used legally incorrect stimuli: *photographs* of Timberland boots and *photographs* of a control boot. Photographs might be just fine in

a survey in an infringement case, where what's going on in the marketplace controls, but not in a case where the goal is to obtain registration of a mark that, by regulation, is required to be in a drawing. See 37 CFR § 2.52; see also Humanoids Grp. v. Rogan, 375 F.3d 301, 308 (4th Cir. 2004). The drawing of the mark must be a substantially exact representation of the mark sought to be registered. 37 CFR § 2.51(a). And it must be a drawing, not a photograph.

Second, the Survey did not use the tried-and-true accepted questions and progression deemed key to determining acquired distinctiveness. The flaws start with not asking the basic, standard first question that acquired distinctiveness surveys lead with: "Do you associate [the stimuli] with one or more than one company?" That question gets at the core issue: do consumers see the stimuli as indicating a single, unique source or not? Because without exclusivity, there can no acquired distinctiveness. Because the Survey failed to ask this simple and accepted question, it falls short of proving that the alleged trade dress here is uniquely associated with a specific source. Two Pesos, 505 U.S. at 766 n.4.

Third, the control stimulus is supposed to look as close to the tested stimulus as possible without having the precise features to be tested.  That helps the survey conductor figure out how much "noise" to deduct from the percentage of people

saying they associated the test stimulus with a given entity. But the Survey went much further, not just altering the precise features claimed, but depicting a control boot that looks nothing like the photograph of the TBL's boot.

The Survey claimed to understand that secondary meaning, as a legal matter, refers to the ability of a word, symbol, or design to identify a single, albeit anonymous, commercial source. The secondary meaning calculations used did not reflect that legal principle. The anonymous source rule reflects that, when determining secondary meaning, the consumer need not be able to actually name the one company the consumer associates exclusively with the mark.

Timberland's advertisements reflect that, for years, if not decades, they taught consumers to associate a light yellow-wheat color with them. In so using the greyscale photos gave respondents an added clue:  the stimulus boot was light in color like TBL's, and the control boot, which was not a TBL boot, was dark. The Survey then used questions guiding people towards the answer of one company. The percentage of people associating the photo with Timberland was only in the 30s.  A marginal figure, at best.

TBL has failed to carry its burden to prove that these eight features are nonfunctional and that consumers recognize these eight features as a unique indicator of the source of the

24

boots. For the foregoing reasons, Defendant's Motion for Summary Judgment should be granted and Plaintiff's motion denied.

An appropriate Order shall issue.

CLAUDE M. HILTON
UNITED STATES DISTRICT JUDGE

Alexandria, Virginia
December 8 , 2022